Our next case for the morning is 415-0848 McGowan v. Illinois Central R.R. Co. For the appellant we have Mr. Kers, is that correct sir? Yes ma'am. Alright, and then for the affilee we have Mr. Wilder. You may proceed counsel. Thank you. Good morning. Mark Kurtz on behalf of the Defendant Appellant, Illinois Central R.R. Co. I'm here today to just discuss a few issues with you that we believe warrant a reversal of this matter. Specifically the statute of limitations under the F.E.L.A. I believe to be the most critical issue before this court. Isn't there a federal discovery rule? There is your honor. It took some 20 pages of your brief to acknowledge that didn't it?       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. And the reason for that, in our view, is quite simple. We don't believe the trial court should have ever gotten to the federal discovery rule because we believe there is a black line, black letter rule, from the United States Supreme Court, 1926, which establishes that a wrongful death case under the F.E.L.A. thus and accrues at death, of the employee, and not later. The discovery rule, which was enacted by the Urie court almost 20 years later, does not apply to a death case. It hasn't been applied to a death case, to my knowledge. We think that the trial court committed reverse lawyer by doing just that, skipping to the federal discovery rule, and then unfortunately complicating that error by not using, if you're going to use the discovery rule, they should have used, the court should have used the F.E.L.A. rule and did not. Instead, the court used a rule which was sort of a version of the Illinois discovery rule, which was far more subjective and an inaccurate statement of federal law. So for all those reasons, it is our position that the court committed reversible error. As this court knows, we have a gentleman here who died and five years later the suit was filed. The F.E.L.A. has a three-year statute of limitations, condition precedent to bring him to suit. It's our position, and we believe the law is squarely behind us, that the three-year statute of limitations vests or accrues no later than the death of the employment. As I've already cited to the Redding case in 1926, the U.S. Supreme Court brought that case down, and it has not been overturned. It is directly on point to the issues before this court in our view. The Supreme Court wanted certainty. They wanted a definite time period for bringing suit. Now, they were only dealing with a two-year statute of limitations under the F.E.L.A. at that time. It was not amended to three years until 1939. But the Supreme Court was responding to lower court confusion, lower court arguments as to when the case accrued, and they definitively ruled that, look, it's not when the administrator is appointed, it's with death. Death is a bright-line test, bright-line way to know when the case accrues. So if the discovery rule applies, they had, or if the discovery rule doesn't apply, this case was filed too late, but if it applies, then why isn't it timely? Okay. If the discovery rule does not apply, then obviously it's too late in our view and under any view. But you're asking me to address the discovery rule you're on? Yes. Yes, the discovery rule in this case. If you're going to use the discovery rule and, again, in our view, ignore the rule from the Supreme Court, then you have to use the discovery rule. So the federal discovery rule doesn't apply to this case because why? For two reasons. It's a wrongful death slash survival act claim. Redding tells us that death is the accrual date. There has been no case. So the federal discovery rule, which was promulgated when? With the Urey court in the 1940s. Meant to exclude the earlier decision that had nothing to do with discovery rules. The Urey court and the Urey opinion, in our view, has only been applied to generally living plaintiffs, not wrongful death actions, not survival actions. There's a distinct difference between the two, obviously. Why? Why is that the rule? Yes. I'm not sure why the Supreme Court did it. Just as a matter of policy, can you explain why that would be the case? Well, the policy from Redding, I think, is a good one. Can you explain why it would be the case that for one series of torts it would apply and in others it wouldn't? Well, I think the Supreme Court, with a living plaintiff, wanted, for example, with Urey, they wanted to give relief to a particular plaintiff who had a disease in that case, which was inherently unknowable was the language they used. There was no way the plaintiff could know the condition he had at the time. It was not known by medical science. That was the Urey case. We don't have that here in our case. We don't have an inherently unknowable injury. In 2003, the link between asbestos and lung cancer was well established. We heard a lengthy testimony about that at trial from a variety of witnesses. So Urey extended relief, extends relief, to certain situations where a plaintiff could not possibly have known. But, again, I don't believe. So if the discovery rule applies to this kind of cause of action, why doesn't it apply in this case? It doesn't. Well, again, I have to say that the Redding court prohibits that. Counsel, I understand your position, but would you answer my question? Yes. You don't need it. Death is the trigger. Death is all we need in this case to put a plaintiff's estate on notice of the facts and potential cause of the condition to investigate and to determine their cause of action. This is an issue of fact that was submitted to the jury that they resolved in favor of the plaintiff, did they not? They did. It's our position. Why should we second-guess the jury's determination on that? Because they were wrongfully instructed. They were given the complete wrong type of instruction and guidance under the discovery rule. If, in fact, arguendo, we're going to assume the discovery rule applies, they have to be instructed on the federal discovery rule, not the state rule. They used the state rule in this case. The court conflicted her language several times in her rulings and her discussions. What's the difference in the language? The key term is wrongfully caused. The state uses wrongfully caused, and that's how the court defined it. They didn't define the term, but that's how it was put into the instruction. But you used it as well, right, in your instruction to the jury. No. On the special interrogatory. Well, that's true only after, I think, three or four interrogatories were rejected that did not contain that word. We had the word potential cause, which is the FVLA standard. The difference is night and day. We were put in a box by the court in our view. We had to attend her special interrogatory, but she would only give the language that comported with her earlier statute of limitations instruction. So we were forced to put wrongful cause in there. And, of course, the jury found the way they did. If you put potential in, it is an entirely different ballgame. Potential, plaintiff's brief says potential, and wrongful cause are identical. Why is it wrongful cause a harder standard for the plaintiff? It's an easier standard for the plaintiff. Why? It's much easier. It seems to me it would be harder. Potential, well, that could be anything. But wrongfully cause, oh, now we're talking about a higher level of proof. Yes. And that's their burden you're talking about. No, but what we're miscommunicating on here is wrongful cause means the plaintiff can wait longer to be sued because they don't even have to know that it's potentially caused by an agent. They have to actually gain the knowledge that it was wrongfully caused. So it would give them the ability to wait years and years longer. The Green Court in Alabama said to the plaintiffs, if we allow the discovery rule to apply to these types of cases, a plaintiff like Plaintiff in Green who had died 25 years before the lawsuit was filed could file suit or his estate could well after that gentleman had died, well after he had suffered anymore. It made no sense. The policy was clear that the discovery rule shouldn't have applied. Did you specifically object to the use of wrongfully in the instruction? Yes, Your Honor. Continuously, constantly. It was one of the longest hearing instruction conferences I've ever been involved in. So that's on the record? Absolutely, Your Honor. And that's part of our brief. It's contained there. There's discussion of that. I understand it's in your brief, but I'm asking to the trial court specifically, did you object to the use of the word wrongfully? Oh, absolutely, Your Honor. And we asked that if wrongful was to be used, that it be defined because wrongful may or may not be clear to a jury. Potential, we think, is much more obvious to a jury if they're going to use it. Again, we were arguing in the alternative here. We didn't think we should even be discussing the discovery rule at that point. In terms of one other error I want to bring up, unless the court would like to hear more about either of these rules, would be the instructional error involving the beneficiaries. Regardless of what the court decides with the statute. In your brief, do you provide a citation to the record where your objection appears to the court's use of wrongfully? I don't know if we provide a citation. I know you forfeited this argument if you failed to do so. I don't believe so, Your Honor. You mean we're supposed to go through the record and find where you made this objection? Well, I don't know if we cited to it or not. Well, if you didn't, then what? Well, Your Honor, I know that we did. So there's a citation in your brief to where this whole discussion appears and you made this objection to the wrongfully. Yes, sir. Okay. Go ahead. Now, on the issue of one of the other instructions, I'd like to bring to the court's attention, and that is the issue of the beneficiaries under the FELA, the instruction that was given to the jury over our objection, that warrants a new trial and damages only if the court does not agree with our statute argument. At the very least, we urge you to issue a new trial for the reason that the court gave an instruction, Plaintiffs 18, I believe, IPI 160.15, which required the jury to fix the amount of money damages for nine different individuals. The widow, Barbara McGowan, her three living sons and her five grandchildren. That instruction had no basis in law, was contrary to FELA law, and greatly prejudiced the defendant. Giving that was an abuse of discretion, greatly inflated the verdict in our view, and warrants a new trial. The FELA has only three classes of beneficiaries. Widow is class one, widow and children. Class two is parents, and class three is next of kin. You can only recover, only one of those three classes can recover. It's in the alternative. If there's a class one, there can be no recovery for class two and three. The five grandchildren who were named in that instruction were class three beneficiaries at best. At the moment Mr. McGowan died, it vested, the case vested, the cause of action vested in the widow. The widow is class one, obviously. Those class three beneficiaries are not entitled to recover. They shouldn't have been on the instruction. And plaintiffs don't argue against that in the brief. That point is essentially conceded. We know that the beneficiary vests at the death of the employee because the Supreme Court has told us as much. Wrongful death actions accrue when the employee dies. It's a final and absolute vesting of the cause of action in the beneficiary. That's the Wells-Dickey case. When Paul McGowan died in 2003, the case vested in his wife, Barbara, and potentially his three adult children if they could show pecuniary loss. And I'll address that in a moment if I may. Yet somehow at trial, over strenuous objection, the plaintiff convinced the trial court to allow the grandchildren and then the adult children to be listed on this particular instruction which told them they must fix money damages and to compensate nine people as opposed to one, Barbara McGowan. And they seized upon this in closing argument by referencing these children and these grandchildren as the true beneficiaries of this lawsuit when in fact that is not the case under the FDLA. The beneficiary was only Barbara McGowan. Plaintiffs don't address any of the law we bring forth. They simply try to claim that we waive this argument by not saying who the beneficiaries were in 2008. Now, of course, we believe based upon the Supreme Court that in 2003 is when this case accrued. That's what the Wells-Dickey case tells us. For beneficiary purposes I'm talking here. But even if you accept that argument, in 2008 the class one beneficiary was Barbara McGowan. She was alive. She was alive at trial. May still be alive today. She is a class one beneficiary, thereby excluding the presence of the grandchildren from that instruction. Now, as to the adult children, they can recover, but they can only recover if they can show pecuniary loss under Vreeland, the Supreme Court case. An adult child must show that they were receiving pecuniary benefits from the decedent at the time of his death or reasonably expected to receive pecuniary benefits in the future. That's the Cozart case. In this matter we have no proof of any of those three. None whatsoever. Two of the children, Paul and Doug, the sons, did not testify nor was there any testimony from or about them receiving pecuniary benefits from their father. Brian, the special administrator's son, testified that he had a good job, good education, was independent, had a family, and was not receiving any monies from his parents, specifically his father Paul. But he had no reason to expect monies from him in the future. The mere fact that he lived in a home that Paul allowed him to live in during college is not the type of pecuniary benefit that the Supreme Court envisioned. And these three gentlemen, these three adult children, could not and cannot recover for loss of moral guidance, training, instruction, et cetera, because that is not allowed under the FAA. That type of damages is only allowed for a child from their minority. That's the Holbrook case. That's a 100-year-old case now. So I guess the ultimate issue on this instructional error is prejudice. Did it create prejudice? And this Court knows it's difficult to demonstrate prejudice. We can't bring you juror affidavits. That would not be allowed. We're not alleging the jurors had an outside influence. But I think that the prejudice is real. I think it's obvious here. $2,050,000 verdict on the wrongful death portion of the claim based upon this instruction. Eight people more, nine people, eight of whom had no reason under the law to be on that instruction or included. And significantly, the instruction had the words, you must fix the amount of money. Obviously, it's intuitive that a jury is going to award more for nine people than one. And you'd have to ask yourself, this was a lengthy, lengthy argument on an instruction conference. Why did the plaintiff argue so hard to have these nine people in there? And the answer is very obvious. It doesn't take any particular expertise to see it. It inflates the value. And we think that's exactly what happened here. I don't think there's really any question. We have an instruction that had no business being there. It was not harmless error. It was real error to my client and to Illinois Central and warrants a new trial. So for those reasons, we would ask for that. I'm going to go back to if you have additional questions on the discovery rule or on the presentation agenda. Well, I have your brief in front of me, Counsel, and I'm looking for the citation to where you objected to this discovery, the wrongfully used language. I will attempt to find it for you. Okay. Well, I know that Mr. Wilder will be speaking, and perhaps if you have your brief, you can find out where it is. Maybe I just missed it. I will do so. Thank you. Thank you, Counsel. You'll have more time on rebuttal. Mr. Wilder. Jim Wilder for the plaintiff. I'd like to tell you I just spent the last ten minutes flipping through his brief, but I didn't. I'm sorry. I'm sorry. I've got to call. I'd like to say I just spent the last ten minutes flipping through his brief for that, but I didn't. I was taking other notes. So I'm sorry I can't give you a page whether there is or isn't one specifically where they say that. I represent the plaintiffs. We've asked you to affirm. I'd like to address only a couple of things. Also, because we responded in the briefs, one of them is the discovery rule. There is a federal discovery rule. It starts with URI. The federal appellate court has called that the precursor, if you will. They apply it in a silicosis case, and it's a FELA action. So it's in a FELA where that begins. A fellow worked forever and he had silicosis. That's 21 years after the reading case. Another thing that was discussed was the issue, which I guess maybe was an issue back in 1920s, whether or not the three years ran at the date of death or the date that the special administrator was appointed. It had nothing to do with discovering the cause or governing cause or potential cause or anything else. They pointed out that somebody could delay appointing a special administrator for decades, perhaps, and then say now we're going to appoint somebody. It had nothing to do with causation. So I'm not even sure how much reading applies to what we're discussing here. But the idea that yes, there's a discovery rule. Yes, it applies, as the First, Seventh, Fourth, Fifth, D.C. Circuits have all said, in cases whether it be under the FTCAA, Federal Tort Claims Act, or FELA, the idea that that would only be for living plaintiffs and not deceased plaintiffs is not borne out by logic. And it's true there's not a lot of cases, but one that we have cited in the brief on this issue and applies the discovery rule, and that's what I was looking up, is the Skira case, S-K-W-I-R-A. Skira, it's a FTCA. Is that a deceased person or a? Yeah, I'm going to give you a. Okay. It's Skira, S-K-W-I-R-A. It's a First Circuit appellate decision from 2003. Mr. Skira goes into the hospital February 15 of 1996. He dies unexpectedly February 18 of 1996. It turns out there was a nurse who was giving epinephrine to simulate natural death of people, and he died unexpectedly. The police asked the family to exhume the body in November of 1996. By then there had been press reports that this nurse was under investigation. They exhumed the body, did an autopsy in November of 1996, and determined that he had drugs in his system which shouldn't have been there in high levels. The police then began criminal prosecution against the nurse, and the family filed their claim October 21 of 1999. And the discussion by Skira is it's time barred, but it's time barred because Skira of the First Circuit appellate court says that the family, the trial judge and the appellate court find that the fact that there had been a, by November of 1996 they'd been asked to exhume the body. They've had the autopsy that the three years began at least on the day after the autopsy when they said he's got drugs in his system that should never have been there, and it's more than three years, or it was more than the time period. The autopsy demonstrated the death certificate was incorrect. These accumulated facts provided a sufficient basis in November of 1996 for a reasonable person to believe there was a causal connection, and the FTCA is a two-year statute of limitations, not three. And in November of 1996 for a reasonable person to believe there was a causal connection, and the acts or omissions of a government employee were a cause, therefore the two-year statute of limitations clock began ticking at that point. That point is November, autopsy was November 7 of 96, so that would be November 8 of 96, which is not the date of death. He died February 18 of 96. That is the only one I can find in our briefs, but that is a death case, and it applies to discovery rule, and that's a federal First Circuit case. But is it, was not under FELA though? No, it's under the Federal Tort Claims Act. But even the Federal Tort Claims Act and FELA, FELA is the three years, Federal Tort Claims Act is two years, but they both basically go back to URI in the application of discovery rule. Both sides cite Federal Tort Claims Act to you in our briefs. But I understood opposing counsel's distinction to be that in the FELA cases that this has not been applied with a death. There's no decision I can find that says it doesn't apply. I can find a decision, the Tolsten decision we cite, which basically I believe says it applies to all types of cases, the URI rule, all federal cases, if you will. We discuss that in our brief. There's one subset about credit recovery, but other than that, it applies whether it's FTCA or FELA, and it all goes back to URI, which happens to be FELA. And I'm not sure who's taken it to the appellate level to say, yes, we agree there's a discovery rule under URI, which they eventually do in their brief. Under URI, we agree there's a discovery rule for people who are still alive, but if it's a deceased plaintiff, no, there's no discovery rule because of this case that's 21 years before URI that just discussed, is it date of death or when you get around to appointing somebody. It had nothing to do with this discussion that runs through the FTCA and the FELA cases, which is when did you know you had harm, and when did you know or should have known of the governing cause, potential cause, whatever you want to say, or in some instances, just that it could be related to employment. So this was correctly determined by Judge Foley, and she did not apply the Illinois law. That's cited in the brief. She references the federal cases when she's ruling on motions for directed verdict. I actually moved for one on the affirmative defense because I thought I won that there was no proof to even take it to the jury. I lost. This is probably the first motion for directed verdict as a plaintiff I've done in quite a few years. But I was like, well, discovery rule does apply, and there's nothing in this record that could allow a jury to determine it was time barred. I lost on that, but we won with the jury's determination, and we won with the jury's answer to their special interrogatory, asking if it was time to file an offense. What about the damages here? I'm sorry, Judge, I didn't hear the part. The damages. I don't understand how we have false children and grandchildren included in the damages instruction. What's the basis for that? Adult children, if they're getting support or there's evidence they could or get support, Mark just mentioned, you can put them on. They're a class one claimant, adult children. Brian had gotten support throughout college, and Brian had a relationship. So we did name them. They're a class one beneficiary. At the time, he just said, at the time Paul dies, that's when it does, the class one beneficiary. Cindy Cashner was alive. She was alive. That's the daughter. She was alive when we filed the suit. She got murdered while the suit pended. But at the time, I mean, it's unrelated to anything here. She was alive, and so we named her, too. She was a class one beneficiary. Eventually we amended it to reflect her kids because under Illinois, I can't find a FELA case on that, but under Illinois law, if I've got a right when my mom dies, and then I, you know. What's the pecuniary loss that you presented evidence on here? Pecuniary loss evidence as the grandkids, Judge? Yes. I don't think we did present any, but we did. Aren't you required to? We named them, and the jury has to determine it. The jury has to determine that based on the evidence presented. What was the evidence? There was no attempt. We named who the real parties and interests were, but we did not, and I think we said in our briefs, we did not try to get into the grandkids' pecuniary loss, or for that matter. But they had a right. They were the heirs to a class one beneficiary, and I got, just so we're clear, the other daughter was alive, too. She died, Mrs. Duckett, died before the case was filed, but was alive when her dad died, and that's when it best. So when somebody's a class one beneficiary, their heirs step into their rights, if you will, but it doesn't mean that you say, okay, you return damages for the grandkid or whatever. So we named all of them, and I'm telling you, the short answer is we didn't attempt to put in pecuniary loss as a summary. Aren't you required to do that before they can recover damages? There's no showing they recovered damages. Doesn't the Miles case, the U.S. Supreme Court, speak about a pecuniary loss only, and therefore, what's the evidence of that? The evidence, we put in evidence as to Brian. We didn't put in evidence as to the others. We named them. We did not suggest that there should be an amount returned for that. He says, well, the jury was told you must fix the amount for them. He goes on to say, like all the instructions, must fix the amount proven by the evidence, and I didn't argue in my part of closing anything about the grandkids being made to recover, but the grandkids are the two daughters, the class one beneficiaries, where the jury. There are all kinds of people mentioned here, Doug, Derek, Daniel, Dylan, Bruce, that's Diana's work. It's Diana's kids and Cindy's kids, and those were class one beneficiaries at the time their dad died, the two sisters. Wouldn't that have to show that there was a pecuniary, they suffered a pecuniary loss before the jury could be instructed to award damages based there on? The jury wasn't instructed. They had to award the damages to the grandkids. They were told they had to fix the amount proven by the evidence of Vinny, that I thought they had to be named because their moms were class one beneficiaries. But they were directed to fix the amount that would reasonably and fairly compensate and then all of those individuals, right? I believe it says then proven by the evidence, though, doesn't it? One of them I know it does. Right. Pecuniary loss proven by the evidence. There's no nine lines, there's no showing that they returned all of it. It would be speculative to assume they returned it all based on the record, but I'll admit I couldn't find, under Illinois law, it's pretty clear you step into the shoes, and I couldn't find a FELA case that said, no, if you're a class one, I leave four kids when I die, and they got a FELA action, they better make it to the trial or else their rights just disappear. But you concede you did not present any evidence of pecuniary loss on the part of those parties, right? On those grandkids, yeah. We did not attempt to and did not attempt to argue, hey, you should put so much for a grandkid or anything like that. Well, but the problem is from the jury's point of view, why wouldn't they say, well, this is a terrible loss? They had a relationship with their grandpa, and he's now dead, and that's bad, and we're going to give them some damages for that. That wouldn't be consistent with the law, would it? It would not be, and if we assume they follow the law, which is what we do. But how I, you know, I'm a juror. I'm acting in good faith here. And here our fixed amount of money would be easily and fairly compensate all these grandchildren is what the instruction said. And proven by the evidence for pecuniary loss. Did you define pecuniary loss for the jury? I believe, yeah. This instruction is very similar to our wrongful death one where it says pecuniary loss. They include loss of money, benefits, goods, or services. Well, that's pretty broad. What about the benefit? I visited with grandpa, you know, and he was a loving guy, and he supported me in my efforts to do whatever. Is that what pecuniary loss means under FILA? According to that's a FILA instruction, not IPI. And so I'd say, yeah, that's included the money, goods, and services, benefits, and so on. Well, had, for instance, one of these grandkids offered, you offered testimony from one of the grandchildren, but I visited with grandpa, and he was always very encouraging to me. You know, demonstrated his love and, you know, all that stuff. Would that be admissible? It would not be for pecuniary loss, probably. It could be to give a feeling for what kind of person grandpa is because of his FILA action in it, too. To be fair, we didn't put that in, but he's going to say it, and I'll say it now. We did mention one of the grandkids did live with Paul and Barb for a period of time. It was almost like another sibling was almost as old as Brian because the kids were quite a different age. But we didn't ask for an amount as to the grandkids. There's no indication they gave that. It would be speculation to say that. If you say, I don't care, then it would only be on the wrongful death portion, not the survival portion. Well, we got a big verdict here. It's a lot of money, and I don't know, you know, the jury that hasn't been – this hasn't been further clarified. I'm not sure how we can disregard the juries perhaps considering poor grandpa is gone, and let's give some damages for the kids. You could take that position, although even as you phrased it and you're very adept, as you said, the jury perhaps considering. There's no evidence they did consider it. You would presume they followed the instructions. Well, but that might be following the instructions is what I'm saying because the instructions on benefits. What does that mean? But it says proven by the evidence have been lost, and you've got plaintiff's attorneys that didn't stand up. I mean, I never went there and reported. I understand, Judge. You seem to be arguing that, no, there couldn't have been any prejudice because there was no evidence along those lines. Well, then if there's no evidence along those lines, then the jury shouldn't have been instructed in the first instance to even give them the opportunity to return a verdict. Isn't that how it works? That is one way it could work, and if that's so, you should say it's a neutral on the wrongful death, and not on the survival, not on Paul's loss because there they did have evidence. They found him 10% negligent for smoking and so on, but that was a neutral. That's the wrongful death portion if you go that way, and I understand. It was a tough, not tough, it was an unusual. I haven't had a lot of cases, especially on appeal, but that's, we did not. So the verdict was divided into what? Damages for Paul, and then what we call wrongful death damages, one blank, and then reduction due to contrivance to each of those. It wasn't, there was nothing for Brian McGowan, Barb McGowan, any of the kids. So, but that's, I thought they had to be included because those kids were, well, not those kids, those sisters, those daughters were alive. They were a class one beneficiary. I know under Illinois law, they would step in when she was a parent. I feel I can't find a case on it, and they don't cite one really as to what happens if you're alive at the time your dad dies, and then you die before the case gets resolved. It's usually some remedy, but, so that's why they were named. But that would apply to the wrongful death damages. I understand your concern. I had some concern. That's why I didn't address it in public. Well, let me ask you this way. Was the jury's verdict, it came out with, what was it, two million? Two million-something for the wrongful death, a million-something for the survival. Okay. So, which part of that verdict applied to the grandchildren, arguably? The most it could apply to would be the wrongful death part, because on the first half, it's something like a million-four, a million-five. That's for Paul's pain and suffering, loss of his normal life, and so on. There was the million-dollar-plus verdict for Paul, and then it was the two million-dollars. Whatever, if you've got the form in front of you, that's right. It's the first page of their appendix. The two million part is for the wrongful death. So, if you remand for a new trial on wrongful death, that would be that second part, and then it would just be the loss to Barb and any adult kids who lost, had pecuniary loss, but the million-and-a-half as to Paul, or a million-whatever it ended up being after reduction, for Paul's loss of his normal life and his pain and suffering, that's not affected at all by the grandkid issue. I keep thinking my time's up. No, no. The red light will come on when your time's up. Okay. They also, in the briefs, talk about, well, Paul knew, and so on, and I think the fellow in my office who does the briefs, Chip Corwin, did a good job of pointing out, the only exchange on that is Paul's brother Mike is asked about, when did you, Mike, learn? And he goes, well, I think I thought long and hard about this. I think in the 80s, we knew there could be some harm. In the 90s, we started hearing about cancer. He had just testified across. He never discussed asbestos with Paul. He never discussed asbestos and cancer with Paul. And it was the FDA, as Paul had done. And then the follow-up question is, well, when you say we, who's that? Was that the people you worked with and talked with? Yes. Would that include Paul? Yes. So would Paul have known? Mike goes, probably. But, I mean, if I could prevail on a verdict just in some bystander's way, he's probably exposed to his products or something. I mean, that's for the jury to do. That's the best they can do on the idea that discovery rules somehow triggered him. And then Paul dies within three months of being diagnosed. So, you know, I mean, his statute was still alive. I'd be interested, Mr. Browder, in your thoughts on this whole difference about wrongfully versus the alleged federal standard as far as discovery. I think wrongfully was a better term. They tendered a number of special interrogatories that had a number of objectionable things in them. And then eventually they tendered the one that said wrongfully caused. In FELA it says governing cause. You read these opinions, and you have. Governing cause to me means, yet FELA doesn't have proximate cause. The FELA instruction says that their negligence was a cause in whole or in part, which most people say is even weaker than proximate cause. So to have in one part of the instructions in whole or in part, even weaker than proximate cause, and the other parts say it's governing cause, whatever that means, because the way, with all respect to the federal judges who had great careers, governing cause isn't how they use it. Governing cause is what? Isn't really how they analyze it. They analyze it as something different than the governing cause. That would be good for a plaintiff. You had to find out what was the governing cause. And here it could be confusing because smoking. He smoked. Smoking was a cause of this. We told him that. And you could say smoking was a bigger contribution than asbestos. So is smoking the governing cause? They may have determined, the doctors may have decided, and the family may have thought it was smoking, but that wouldn't affect the asbestos, so that's why we used the term wrongfully caused because I thought it fit better. And it's passed review, if you will, by appellate courts over and over in this state. Do you agree that they did object to the use of the term wrongfully on that specific basis? Do you recall? They tendered special interrogatories, I know, that did not have the term wrongfully. Each of them also had a lot of other problems. They attempted to use the term preponderance of evidence and so on. So I kept objecting. And eventually at the end they said, well, tender when it says wrongfully, which I said I can't in good faith object to that one. So it was given without objection. What about the regular instructions on discovery? What about their judgment? As far as the other instructions to the jury other than special interrogatory. I don't think there was any error that would result in reversal. They've raised a number of instructions. But the discovery, again, it didn't accurately state, I don't believe, what the test is under federal law. They've raised discovery instructions. They had a bunch of them. And I objected. And I think Judge Foley correctly said I'm not giving those for the reasons, you know, we cited a lot of law, sort of refreshing, because usually I know the same asbestos cases over and over. Here these were all these federal court cases that you had to learn for. But they were all objectionable. But the general discovery instruction contained the word wrongfully? Yes. And did they object to that or submit alternative instructions? Sure. I'll let Mark speak for himself. I'm certain they objected. They objected about everything they tendered. And they had a bunch of instructions on their side, so they probably had alternatives to most of them. But those alternatives were objectionable because of what they said. Okay. Thank you, counsel. Any rebuttal? Great. I apologize to the court for not being able to tell you directly where in the brief those citations were. Okay. Not us objecting to the statute of limitations discovery rule. Fortunately, they are contained within the brief, pages 34 and 35, as counsel just referenced. When the instruction that the plaintiff tendered was given, we, of course, objected. And we know we objected because we tendered these alternative versions, which did not contain the phrase wrongful cause. In fact, we've set out a couple of the instructions for you, instructions 22 and 23, utilizing the term potential cause, which we believe to be the correct one. And this is with regard to the special interrogatory? The special interrogatory is discussed on page 35. Specifically, our objection there, too, we refer to the transcript volumes 39 and 51 and 52. And we have specific sites to where our various versions were filed. Hopefully that answers your question on that issue, Your Honor. Two other things I want to just briefly touch on that were discussed, this issue of whether the two women children who died between the death and the lawsuit, there was no evidence of pecuniary loss for those two. So the grandkids couldn't be there for the reasons I've already stated. But Cindy and the other sister, I forget her name, could not have been on the instruction either because there was no evidence that they suffered any pecuniary loss if they were in fact alive. So basically you're saying there was nothing to pass to the grandkids, no cause of action to pass to the grandkids. The award would and should have gone to Barbara McGowan. And then, of course, the state probate rules apply and it's distributed to the state accordingly. So for all those reasons, we believe both the children and, Your Honor, you've discussed the pecuniary loss. There simply wasn't any here. The one-time stay in the gentleman's home while you were in college, that's not the kind of pecuniary loss we're talking about. And that happened years before Paul McGowan passed. There were two different sums that the jury came up with in their verdict? Correct. As I recall, yes. As counsel indicated, a wrongful death in a survival act claim, $1 million and change, $2 million and change. Okay. So if we were to agree with you that the grandchildren shouldn't have been included, which verdict would that affect? That would affect the wrongful death claim, which I believe is the, well, it is the $2 million and $50,000. That wouldn't be the survival claim? No, that would be the. . . No, it wouldn't affect the survival claim?  Correct. Yes. Okay. Absolutely. Thank you, counsel. Thank you. Is this matter under advisement? We will recess. Thank you very much.